UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,  Case No. 23-cr-205 (KMM/LIB)

    Plaintiff,

v.  **REPORT AND RECOMMENDATION**

MARK ALLEN ISHAM,

    Defendant.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, and Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25]. The Court held a Motions Hearing on October 16, 2023, regarding the parties' pretrial motions at which the parties requested the opportunity to submit supplemental briefing on the present motion. The supplemental briefing was completed on November 28, 2023, and this Court took Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], under advisement on November 29, 2023.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], be **DENIED**.

**I.    Background**

Mark Allen Isham ("Defendant") is charged with three counts of Assault with dangerous weapons (a wooden cane and a knife) with intent to do bodily harm in violation of Title 18, United States Code, Sections 113(a)(3), 1151, and 1153(a). (Indictment [Docket No. 1]).

## II.     Statement of Facts[1]

Bois Forte Police Department Officer Danielle Boettcher testified that on March 24, 2023, she was informed by her dispatch that a woman, who would be later identified with the initials C.K., had called 911 to report a domestic disturbance with her boyfriend. (Tr. 6-9).[2] The caller indicated that she did not want to be at the boyfriend's house anymore because Defendant had injured her. (Tr. 9-10). Officer Boettcher, along with St. Louis County Deputy Norland, were dispatched to Defendant's home. (Tr. 10-11).

Officer Boettcher was familiar with both Defendant and C.K. from previous encounters and was aware that Defendant and C.K. had a domestic relationship. (Tr. 10,14). Officer Boettcher was also aware that C.K. was a single-leg amputee. (Tr. 14).

When Officer Boettcher arrived, she met Deputy Norland, who was parked at the entry of the driveway leading up to the Defendant's house. (Tr. 11). The pair then walked up the drive to the house. (Tr. 12). Both Officer Boettcher and Deputy Norland were wearing their uniforms at the time. (Tr. 11-12).  When the Officer and Deputy arrived at the house, they looked around the front of the house because they had been told Defendant was outside. (Tr. 12). When they could not find him, they knocked on the door of the home. (Tr. 12; Gov't's Ex. 1 at 0:00:50).

The Defendant answered the door, and Officer Boettcher asked if C.K. was in the house, to which the Defendant told the Officer that she was not. (Tr.13; Gov't's Ex. 1 at 0:00:55). Officer Boettcher then proceeded to explain that C.K. had told dispatch that she was in Defendant's house, and asked Defendant, "Do you mind if I come in and check and see?" (Gov't's Ex. 1 at0:00:58-

---

[1] The facts contained in this section are derived from the parties' testimony and exhibits presented during the motion hearing for this case.
[2] Throughout this Report and Recommendation, the Court refers to the transcript of the October 16, 2023, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 34]).

2

0:01:16). Defendant expressed confusion and Officer followed up by asking if Defendant knew where C.K. was. (Gov't's Ex. 1 at 0:01:16-0:01:25).

The Defendant told Officer Boettcher that the last he knew, she was in "treatment" but did not know where that was. (Gov't's Ex. 1 at 0:01:20-0:01:28). During this conversation, Officer Boettcher testified that she could hear a woman inside the house. (Tr. 13; Gov't's Ex. 1 at 0:01:27-0:01:40). At this point Defendant acknowledged that C.K. was in the house, (Tr. 16; Gov't's Ex. 1 at 0:01:45-0:01:50), and Defendant led Officer Boettcher and Deputy Norland, into his house. (Tr. 15; Gov't's Ex. 1 at 0:01:50-0:02:08). Officer Boettcher testified that she entered the house because she wanted to check to make sure C.K. was safe in light of the domestic abuse 911 call. (Tr. 15).

C.K. was located lying on a bed just inside the doorway of Defendant's house. (Gov't's Ex. 1 at 0:01:29). Officer Boettcher recognized C.K. on the bed and then spoke to her. (Tr. 16; Gov't's Ex. 1 at 0:02:25-0:03:00). C.K. told Officer Boettcher that she desired to "get out of here." (Gov't's Ex. 1 at 0:02:20). Officer Boettcher testified that she believed that C.K. was acting "very guarded" in Defendant's presence. (Tr. 16).

Deputy Norland then asked Defendant if the residence was his and if he would be willing to speak to the Deputy outside. (Gov't's Ex. 1 at 0:04:10). The Defendant confirmed that it was and told Deputy Norland "Sure" before he walked outside with the Deputy. (Gov't's Ex. 1 at 0:04:10-0:04:30).

Deputy Norland asked about Defendant's relationship with C.K. and if he wanted C.K. to continue to be in his house. (Gov't's Ex. 1 at 0:04:30-0:04:43). The Deputy then asked if there had been any physical altercations or arguments between C.K. and Defendant, (Gov't's Ex. 1 at 0:04:55-0:05:03); Defendant told Deputy Norland that there had not been. (Gov't's Ex. 1 at

3

0:05:03-0:05:16). Deputy Norland then inquired if he knew why C.K. had called 911, to which Defendant answered that it was because C.K's phone was not working. (Gov't's Ex. 1 at 0:05:10-0:05:18).

When asked about what C.K. and Defendant had been doing that evening, Defendant replied that they had been watching television. (Gov't's Ex. 1 at 0:05:22-0:05:26). At this point, Deputy Norland informed Defendant that C.K. had called 911 reporting a domestic disturbance and asked if he knew anything about that, (Gov't's Ex. 1 at 0:05:26-0:05:36); Defendant responded he was not aware of any disturbance. (Gov't's Ex. 1 at 0:05:36). At this point, Defendant and Deputy Norland walked back into the house. (Gov't's Ex. 1 at 0:05:51). In total, the interview outside between Deputy Norland and Defendant lasted approximately 1.5 minutes.

During this minute and a half, Officer Boettcher continued to speak to C.K. and asked about injuries to C.K. that she noticed. (Tr. 16-17). C.K. told Officer Boettcher that Defendant had "punched her, hit her and poked her in the eye with a walking stick." (Tr. 17).

When the Defendant and Deputy Norland returned inside the house, Defendant, C.K., and Officer Boettcher briefly discussed where C.K. could go. (Tr. 17; Gov't's Ex. 1 at 0:05:58-0:08:05). Officer Boettcher then asked if Defendant would come outside to talk to her; Defendant agreed. (Tr. 17; Gov't's Ex. 1 at 0:08:05-0:08:09).

The two went outside onto the doorstep where Officer Boettcher asked Defendant if he had any weapons on his person. (Tr. 39). Defendant informed Officer Boettcher that he had knives on him, and she asked him if he would remove and place his knives on the step. (Tr. 39). Officer Boettcher testified that she then asked Defendant what had happened between him and C.K. (Tr. 39). She further testified that Defendant admitted that he had hit and punched C.K. (Tr. 39).

During this exchange, Officer Boettcher testified that Defendant did not appear to be under the influence of drugs or alcohol, and he appeared coherent and of at least average intelligence. (Tr. 18-19). In her testimony, Officer Boettcher indicated that she was armed, but she did not draw her firearm, and at no point did she raise her voice to Defendant, threaten him, deceive him, or restrain his movements in any way prior to his later arrest. (Tr. 19-20).

After Defendant had admitted that he had hit and punched C.K., Officer Boettcher decided then to arrest Isham for assault, and after she escorted Defendant to her patrol car, she placed him in handcuffs. (Tr. 19-20, 37).

Defendant was Federally indicted on May 31, 2023, on three counts of Assault with dangerous weapons (a wooden cane and a knife) with intent to do bodily harm in violation of Title 18, United States Code, Sections 113(a)(3), 1151, and 1153(a). (Indictment [Docket No. 1]).

**Defendant's Motion to Suppress Statements. [Docket No. 25].**

Defendant seeks an Order of this Court to suppress evidence of his statements made to Deputy Norland and Officer Boettcher outside of his residence on March 24, 2023. (Defendant's Motion to Suppress Defendant's Statements [Docket No. 25]).

   **A.  Standard of Review**

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Law enforcement must provide a Miranda advisory prior to interrogation when a person has been "taken into custody or otherwise deprived of [their] freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct.

5

1526, 128 L. Ed. 2d 293 (1994) (quoting Miranda, 384 U.S. at 444). Significantly, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render [them] in custody." Id. (internal quotation omitted).

The Eighth Circuit considers six (6) factors when evaluating whether an individual is "in custody" for the purposes of Miranda:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)).

"The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). None of the six factors, however, is entirely dispositive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)). Because the ultimate custody determination is based on the totality of the circumstances, a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at

6

1347, 1349. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322.

"In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145, 125 S. Ct. 1292, 161 L. Ed. 2d 105 (2005). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

A custodial interrogation is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." Miranda, 384 U.S. at 444. Courts define interrogation as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

B. Analysis

1. Knowledge that Encounter was Voluntary

Looking at the Griffin factors one at a time, the first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. Sanchez, 676 F.3d at 630-31. Here, there is no indication that the officers communicated to Defendant that he was free to leave or decline to answer any questions. Instead, when asked, Defendant voluntarily agreed to talk to both Deputy Norland and Officer Boettcher on Defendant's front doorstep, mere feet away from the location where Defendant was sitting while inside the house. (Gov't's Ex. 1 at 0:04:20-0:05:50, 0:05:50-0:08:40). While the officers never verbally stated that Defendant was free to leave or decline questioning, they did not order the Defendant to speak with them; accordingly, a reasonable person in the Defendant's circumstances would conclude that talking to the police during the encounter would be voluntary.

Accordingly, this factor is at least neutral when considering whether Defendant was in custody during the March 24, 2023, interviews.

**2. Restraint on Freedom**

Defendant also argues his freedom of movement during the March 24, 2023, interview was curtailed because Deputy Norland stood at the front door of his residence during the interview. (Defendant's Post-Hearing Memo. in Support of Motion to Suppress Statements [Docket No. 36] at p. 5). Defendant argues that a reasonable person would have believed Deputy Norland blocked the front door to prevent him from leaving. Id. As previously discussed, the key inquiry is whether, at the time of the interview, there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322.

Here, when Deputy Norland interviewed Defendant outside of his residence, there was no formal arrest, nor any physical restraint placed on Defendant to the degree that could be associated with a formal arrest. Contrary to Defendant's assertions, when Deputy Norland conducted the

8

doorstep interview, the Deputy was standing to the side of Defendant as seen on the recorded body camera footage. (Gov't's Ex. 1 at 0:04:30-0:05:51). Indeed, Defendant had the option to either turn around to go back in the house (which he did when the interview concluded) or walk forward on the path leading to the driveway.

As for Defendant's later interview alsoon the doorstep with Officer Boettcher, it is not clear what the exact positioning of the two was since Officer Boettcher did not have a body-mounted camera. However, Defendant does not argue that he was physically restrained by either Officer Boettcher or Deputy Norland (outside of his eventual arrest), but rather argues that the Officers' visible sidearms would have struck fear in a person preventing them from believing they could leave.   While the uniform of a police officer may subjectively intimidate someone, the objective inquiry is whether a defendant's movement was <u>actually</u> restrained by the police. See <u>United States v. Skog</u>, No. 18-cr-085 (WMW/HB), 2018 U.S. Dist. LEXIS 175245, 2018 WL 4938718, at *8 (D. Minn. Aug. 28, 2018) (finding that law enforcement interviewing the defendant on his front lawn weighed against finding that the interrogation of the defendant was custodial in nature). Aside from simply asking Defendant to remove his knives and place them on the porch step while she was alone interviewing him, Officer Boettcher did not control, direct, or restrict Defendant's movement until <u>after</u> his confession (which led to his later arrest). (Tr. 20).

The second <u>Griffin</u> factor, therefore, weighs against a finding of Defendant being in custody during the March 24, 2023, interviews.

### 3. Initiated Contact/Voluntary Acquiescence

Statements to law enforcement officers are voluntary "if they are the product of an essentially free and unconstrained choice by [their] maker." <u>United States v. Vinton</u>, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations omitted) (brackets in original). "A statement is not

9

considered involuntary unless 'the police extorted it from the accused by means of coercive activity.'" Id. at 482 (quoting Jenner v. Smith, 982 F.2d 329, 333 (8th Cir. 1993)). In assessing the voluntariness of a statement, the Court looks to the totality of the circumstances, considering "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physician condition, and mental condition." United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012) (quoting United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011)).

In the present case, the factors indicate that Defendant's statements were voluntary.

First, law enforcement initiated the interaction with the Defendant by arriving at his house and asking to talk to him on his front steps. Despite not being told that he could cease talking to the police at any time, the record shows that Defendant voluntarily participated in and continued talking to law enforcement without ever seeking to end the March 24, 2023, interviews. This is highlighted in the fact that there is no evidence on the record that the two officers used coercive methods such as threats, intimidation, confusing questions, or even raised their voices. (Tr. 19-20; Gov'ts Ex. 1 at 0:04:20-0:05:50).

Second, both interviews were short, with the first with Deputy Norland lasting only one and a half minutes and the second with Officer Boettcher lasting only three minutes. (Tr. 19; Gov't Ex. 1 at 0:04:20-0:05:50). This brevity of the interaction suggests that the interviews were not coercive. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) (finding that an interview lasting approximately two hours was not "particularly lengthy" that it would be considered coercive).

Thirdly, the location of both interviews outside on Defendant's doorstep suggests that the location was not coercive since as stated in the section above, Defendant was not restricted from

leaving the doorstep if he pleased. In addition, Defendant was at his own home, which alone suggests a certain amount of inherent comfort as compared to an interview in a law enforcement facility which may be a situation resembling formal arrest.

As for Defendant's maturity, education, physical condition, and mental condition, Officer Boettcher testified that there was no evidence of diminished mental capacity or below average intelligence. (Tr. 19). Throughout Defendant's recorded March 24, 2023, interaction with the police, Defendant appeared to be responsive and coherent with no signs of intoxication. (See generally Gov'ts Ex.1).

Accordingly, the third Griffin factor also weighs against a finding that Defendant was in custody. See Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning even though he did not initiate contact with the police).

**4. Strong Arm or Deceptive Tactics**

Defendant argues that because Defendant's interview with Officer Boettcher was not recorded, there is no objective evidence that she did not use deceptive tactics or strategies when questioning Defendant. (Defendant's Post-Hearing Memo. in Support of Motion to Suppress Statements [Docket No. 36] at p. 6). Officer Boettcher testified that the Bois Forte Police Department did not have body-worn cameras but did have microphones that connected to their squad vehicle. (Tr. 25). However, due to a technical problem, Officer Boettcher's recording appears to have malfunctioned and has not been recovered. (Tr. 27).

Officer Boettcher's testimony depicts that she did not use strong arm or deceptive tactics to elicit Defendant's confession; however, the Court notes that a recording would make the determination of whether such tactics were employed far easier. On the other hand, Defendant has

11

not offered, nor even proffered, evidence showing the presence of deceptive or strong arm tactics by Officer Boettcher that would make a reasonable person believe they were in custody. While Officer Boettcher may have conducted the interview with the intent of eliciting the confession that Defendant gave, this is alone not enough to establish a showing of custody under this Griffin factor. See United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006) (holding that law enforcement's subjective intent to elicit a confession is not the kind of deceit which would "prevent a reasonable person from terminating the interview"); see also United States v. Laurita, 821 F.3d 1020, 1026 (8th Cir. 2016) ("[D]eception [by law enforcement] is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.").

Accordingly, this Griffin factor weighs against a finding that Defendant was in custody during the March 24, 2023, interview.

### 5. Police Dominated Atmosphere

The fifth factor, which addresses whether questioning took place in a "police dominated atmosphere," weighs only slightly in favor of finding that Defendant was in custody during the March 24, 2023, interview. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the [interaction] was police dominated." United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990).[3] In United States v. Ollie, the suspect was questioned in a small conference room at the police station, with only one officer present. The Court found that "the interview took place in a police-dominated

---

[3] The length of an interview, location, and officer's demeanor all contribute to the atmosphere and can influence whether a reasonable person would believe they were free to leave. See Axsom, 289 F.3d at 502 (concluding the district court erred in finding an interview was police dominated because, although nine federal agents were present in the suspect's home where the interview took place, "only two agents conducted the interview[,]" "[c]ommunication between the agents and [the suspect] consisted of two-way questioning," and photographs of the scene "reflect[ed] a more casual scene than a police dominated, inherently coercive interrogation"); Czichray, 378 F.3d at 825, 830 (ruling a "nearly seven[-]hour[]" interview where agents arrived at the suspect's home at 6:30 a.m., demanded he answer the door, instructed the suspect to call in sick to work, and told the suspect they would "'light up his world'" if he did not cooperate was not custodial).

atmosphere and that this atmosphere would have restrained a reasonable person's movements." Ollie, 442 F.3d at 1139. The Court reasoned that "[i]nterviews taking place on the police officers' 'home turf' are more likely to be police-dominated." Id. However, on the other hand, an environment is not a "police dominated atmosphere" simply because it took place at a police station. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.").

In the present case, the two interviews took place at Defendant's own home. The interviews were one-on-one, with the non-interviewing officer talking to C.K. Furthermore, C.K. was still on a bed inside the house at the time of the Defendant's interview within earshot. See United States v. Lussier, No. 19-cr-0087 (WMW/LIB), 2019 U.S. Dist. LEXIS 138348, 2019 WL 3847296, at *3 (D. Minn. July 2, 2019), report and recommendation adopted by 2019 U.S. Dist. LEXIS 137860, 2019 WL 3841226 (D. Minn. Aug. 15, 2019) (finding that the defendant remaining unrestrained in his grandpa's driveway within earshot of his mother and grandfather weighed against finding that the Interview was police dominated); see also, United States v. Wilson, No. 20-cr-0038 (PJS/LIB), 2021 U.S. Dist. LEXIS 27878, at *17 (D. Minn, Jan. 25, 2021), report and recommendation adopted by 2021 U.S. Dist. LEXIS 27330, 2021 WL 533686 (D. Minn. Feb. 12, 2021) (finding that defendant's interview with other people nearby on the front steps of his residence was not police dominated).

As such, this fifth Griffin factor weighs in favor of finding that Defendant was not in custody.

**6. Arrest at the End of the Encounter**

13

Finally, Defendant was ultimately arrested after the encounters with Deputy Norland and Officer Boettcher. (Tr. 19-20, 37). As such, this factor weighs toward a finding that Defendant was in custody during the March 24, 2024, encounter. C.f., United States v. Chapman, No. 18-cr-250 (ECT/SER), 2019 U.S. Dist. LEXIS 59156, 2019 WL 2016799, at *8 (D. Minn. Feb. 14, 2019) (finding that where law enforcement did not arrest the defendant at the conclusion of their interview, it weighed against finding the defendant was in custody).

However, the mere fact of an arrest at the end of an interview after a confession is not a dispositive circumstance "indicative of custody because 'custodial status depends on whether a reasonable person would feel free to leave during the interview.'" United States v. Hallmon, No. 22-CR-365 (KMM/DTS), 2023 WL 6285183, at *11 n.13 (D. Minn. Sept. 27, 2023) (quoting United States v. Treanton, 57 F.4th 638, 641 (8th Cir. 2023)) (emphasis added). Instead, if such an arrest did occur, the factor may weigh toward a finding that Defendant was in custody. See Lussier, No. 19-cr-0087 (WMW/LIB), 2019 U.S. Dist. LEXIS 138348, 2019 WL 3847296, at *13.

**7. Other Circumstances**

The Eighth Circuit has made clear that the above-listed factors are not the exclusive circumstances that a court may consider when determining whether a suspect is in custody for the purposes of Miranda. See, e.g., Sanchez, 676 F.3d at 630-31. In the present case, the general character of the March 24, 2023, encounter at Defendant's home as a whole weighs against a finding that Defendant was in custody during the encounter. For most of the encounter involving the two interviews, Defendant either stood on the doorstep of his home or was in his chair with C.K. on the bed only a few feet away. See Axsom, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."). Also, at no time, until his eventual arrest, was Defendant physically restrained or

14

subject to any search of his person whatsoever. Accordingly, these other circumstances weigh in support of a finding that Defendant was not in custody during the two interviews at issue. See United States v. Larson, No. 19-cr-27 (DWF/LIB), 2019 U.S. Dist. LEXIS 105195, 2019 WL 2587915, at *10 (D. Minn. June 6, 2019) (finding that the general character of an interview was non-custodial where the interview occurred in the defendant's living room and where the defendant was not subject to any search of his person).

Accordingly, based on all the circumstances and giving due weight to each of the factors under Griffin, the Court finds that a reasonable person in the Defendant's position would not have understood himself to be in custody during the two, brief police interviews with Deputy Norland or Officer Boettcher on March 24, 2023.

Therefore, the undersigned recommends that Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], be **DENIED** regarding the statements he made during the March 24, 2023, encounters with law enforcement outside of his home.

### III. Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], be **DENIED**.

Dated: December 13, 2023                               s/Leo I. Brisbois
                                                       Hon. Leo I. Brisbois
                                                       U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.