UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-205 (KMM/LIB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **TRIAL BRIEF OF THE** |
| | ) | **UNITED STATES** |
| | ) | |
| MARK ALLEN ISHAM | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America by and through its attorneys, Andrew M.

Luger, United States Attorney for the District of Minnesota, and Assistant

United States Attorneys Carla J. Baumel and Nichole J. Carter, respectfully

submits its trial brief in the above-captioned case.

## I.    TRIAL COUNSEL

The United States will be represented by the following counsel:

> Assistant U.S. Attorney Carla J. Baumel
> 300 South Fourth Street, Suite 600
> Minneapolis, MN 55415
> Desk: 612.664.5652
> Cell:  612.432.6360
> Carla.Baumel@usdoj.gov

> Assistant U.S. Attorney Nichole J. Carter
> 300 South Fourth Street, Suite 600
> Minneapolis, MN 55415
> Desk: 612.664.5636
> Cell:  612.207.0212
> Nichole.Carter@usdoj.gov

## II.    INDICTMENT

Defendant Mark Allen Isham is charged by indictment with violating three separate subsections of 18 U.S.C. § 113 (felony assault). He charged with: Assault with a Dangerous Weapon (Subsection 113(a)(3), Count I); Assault Resulting in Serious Bodily Injury (Subsection 113(a)(6), Count II), and Assault Resulting in Substantial Bodily Injury to an Intimate Partner (Subsection 113(a)(7), Count III). Jurisdiction is derived from 18 U.S.C. §§ 1151, and 1153(a) because Mr. Isham is an Indian and the underlying conduct took place within the exterior boundaries of the Bois Forte Band of Chippewa Indian Reservation.

## III.    TAMPERING

As discussed above, on May 31, 2023, Mr. Isham was charged in a three count Indictment for domestic abuse violations involving C.R.K. Since August 14, 2023, Mr. Isham has been living at a halfway house in St. Paul, Minnesota pursuant an Order Setting Conditions of Release. (ECF No. 18). Those conditions included, *inter alia*, that: the defendant must not violate any federal, state, tribal, or local laws while on release; avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution; maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary, and observe the rules and regulations of that

facility. *Id*. Those conditions were modified on March 14, 2024 to remove the GPS monitoring condition previously applied.  (ECF Nos. 46-48.)

Within the last week of pretrial preparations, C.R.K. reported to law enforcement that Mr. Isham has telephonically contacted her on several (ten or more) occasions. More specifically, C.R.K. reported that Mr. Isham began contacting her in approximately January of 2024. The telephonic contact ended in approximately April of 2024. Mr. Isham reported that he used someone else's phone to contact her cell phone. In these telephone calls, Mr. Isham discussed the upcoming trial proceedings.

Mr. Isham told C.R.K. he had "served enough [prison] time" for similar incidents in the past. Mr. Isham directed C.R.K. that she need not testify, including the suggestion that she "maybe you shouldn't go [to court]."  Further, Mr. Isham instructed C.R.K. what to say and what not to say if she did testify. For example, Mr. Isham told C.R.K. to testify to a false narrative that ostensibly would afford him the opportunity to argue self-defense, notwithstanding his prior statement to law enforcement about the abuse. Further, Mr. Isham told C.R.K. not to testify about any dangerous weapon, acknowledging that such facts would be especially detrimental to him from a sentencing standpoint should a conviction occur. Finally, Mr. Isham also told C.R.K. not to tell anyone that he was calling her because he knew he was not supposed to be in contact with her whatsoever.

3

These recently discovered facts not only represent a substantial violation of Mr. Isham's conditions of pretrial release, but also one or more violations of 18 U.S.C. § 1512(b)(1) (Tampering With a Witness). Such brazen conduct towards a victim of abuse on the eve of trial warrants a significant response. It is the government's strong view that this newly discovered conduct, however, should not affect the current trial setting. The government will continue to comply with its discovery obligations with respect to this information and will be prepared to address these issues at the Court's convenience.

## IV.   TRIAL LENGTH

The government estimates that its case-in-chief, including of jury selection and charging, will last approximately three trial days.

## V.   ELEMENTS OF THE CHARGED OFFENSE

The following elements apply to the charged conduct contained in Counts I-III of the Indictment:[1]

*Count I*. The crime of assault with a dangerous weapon, as charged in Count 1 of the Indictment, has four[2] elements: One, on or about March 19,

---

[1] The following instructions are taken from the 2023 Eighth Circuit Model Criminal Jury Instructions, specifically Instruction Nos. 6.18.113(3) (Dangerous Weapon); 6.18.113(6) (Serious Bodily Injury); 6.18.113(7) (Substantial Bodily Injury).

[2] Mr. Isham noticed affirmative defense, including voluntary intoxication as to Count I and self defense as to Counts I-III, on October 23, 2023. (ECF No. 32). In a pretrial meet and confer on May 2, 2024, Defense Counsel confirmed its intention to persist in these defenses at trial. As discussed below, however, Defendant bears the initial

2023, Mr. Isham assaulted C.R.K. with the specific intent to cause bodily harm; Two, Mr. Isham used a dangerous weapon, specifically a cane and a stick with a knife; Three, the assault happened within the exterior boundaries of the Bois Forte Band of Chippewa Indian Reservation; and Four, Mr. Isham is an Indian.

*Count II.* The crime of assault resulting in serious bodily injury, as charged in Count 2 of the Indictment, has four elements: One, on or about March 19, 2023, Mr. Isham assaulted C.R.K.; Two, as a result of that assault C.R.K. suffered serious bodily injury; Three, the assault happened within the exterior boundaries of the Bois Forte Band of Chippewa Indian Reservation; and Four, Mr. Isham is an Indian.

*Count III.* The crime of assault resulting in substantial bodily injury, as charged in Count 3 of the Indictment, has four elements: One, on or about March 19, 2023, Mr. Isham assaulted C.R.K.; Two, as a result of that assault C.R.K. suffered substantial bodily injury; Three, C.R.K. was an intimate partner of Mr. Isham; Four, the assault happened within the exterior boundaries of the Bois Forte Band of Chippewa Indian Reservation; and Five, Mr. Isham is an Indian.

"Serious bodily injury" means bodily injury which involves a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or

---

burden of production as to self defense to warrant the inclusion of the element (i.e., that the Defendant did not act in self defense) in the charged instructions.

protracted loss or impairment of the functions of a bodily member, organ or mental faculty.

Injury which is "substantial" is distinct from "serious bodily injury" means bodily injury which involves a temporary but substantial disfigurement or temporary but substantial loss or impairment of the function of a bodily member, organ or mental faculty.

A "spouse or intimate partner" means a spouse or former spouse, a person who has a child with Mr. Isham, a person who has previously or does currently cohabitate with Mr. Isham, or a person with whom Mr. Isham has a romantic or intimate relationship. The government's theory of the case is that Mr. Isham and C.R.K. are intimate partners as they share two children in common.

## VI.   SUMMARY OF THE EVIDENCE AT TRIAL

The United States anticipates the evidence at trial will prove the following facts:

a.   *Mr. Isham Brutally Beats and Confines C.R.K.—a Single-Leg Amputee—at his Home on the Bois Forte Indian Reservation*

Mr. Isham and C.R.K. have been in an on and off again domestic relationship for over twenty years. They share two children who are now approximately 20 and 22 years old, respectively.

On Monday, March 13, 2023, C.R.K. was nearing completion of a

treatment program at the Range Treatment Facility in Virginia, Minnesota. She had been experiencing recurring housing issues and considered herself homeless at the time. While she arranged to transfer to a shelter in Duluth on Wednesday, March 15, 2023, Mr. Isham and C.R.K. spoke by phone and he came to pick her up from the treatment center on or about Monday, March 13, 2023. Mr. Isham did not own a vehicle, but borrowed his son's car to drive to Virginia. C.R.K. had only intended to stay with Mr. Isham for a couple of days.

On the way back from picking up C.R.K. from treatment, Mr. Isham stopped at the Y-Store for vodka. The Y-Store is a convenience store owned by the Bois Forte Band of Chippewa that sells basic food wares including alcohol.

When the pair arrived at Mr. Isham's home, Mr. Isham carried C.R.K.— a single-leg amputee—into the home and kept her wheelchair outside. There was significant snow cover on the ground in March 2023. C.R.K. reported that she spent most of the time in the home on a bed in the living room.



During the first night of C.R.K.'s stay at Mr. Isham's home, the couple

started drinking in the evening. Isham proceeded to argue with C.R.K., which escalated to punching her in the head and face with a closed fist. With no vehicle and no wheelchair in winter, C.R.K. did no effective means of leaving. She also had no minutes on her phone, and thus was unable to communicate with anyone outside the home. The home—located within the exterior boundaries of the Bois Forte Band of Chippewa Indian Reservation—also had no running water or heat source, other than a wood stove. The home was extremely cluttered, making it very difficult to move inside the home, particularly for a single-leg amputee.

About five days later, on or about Sunday, March 19, 2023, the couple was again drinking when Mr. Isham became angry with C.R.K. Mr. Isham started punching C.R.K. with a closed fist. Then, Mr. Isham grabbed a wooden cane that he made for C.R.K. and struck her with it repeatedly. He struck her head, arms, and legs. Mr. Isham also used a stick with a knife taped onto it to prod at C.R.K.'s face. C.R.K. will describe how this beating felt like it lasted "all night long." When the beating ended, Mr. Isham force fed C.R.K. her feces.

C.R.K. recalls crying and asking Mr. Isham repeatedly to stop. Mr. Isham threatened C.R.K. throughout the abuse. He screamed, "I should just fuckin' kill you" and "I should just fuckin' tie you up." C.R.K.—trapped without her chair in Mr. Isham's house—was confined during the beating to the bed located in the living room. Mr. Isham broke C.R.K.'s glasses during the during

the beating and kept the cane and stick alongside the wall facing the bed. C.R.K.'s visible injuries at the time included a split lip, a black eye, and bruising on her arms, legs, and head. Blood stained the sheets of the bed.

The next morning C.R.K. felt terrible and sore. Mr. Isham lay next to her on the bed where she lay beaten. He cried to her and apologized. He also told C.R.K. that she could not leave his house.

Later that week, Mr. Isham's uncle came to the house once, but he did not make contact with C.R.K.

b.   *After C.R.K. Calls 911, Mr. Isham Lies to Police About C.R.K. Being Inside the House and then Confesses to Hitting Her*

In the days following the abuse, C.R.K. was scared and increasingly sore from the injuries sustained from the second beating with the cane and stick. She recalls eventually seeing herself in the mirror and thinking she looked awful and needed to escape. In the early morning hours of March 24, 2023, C.R.K. used her phone to call 911 when Mr. Isham was outside chopping wood.

C.R.K.'s call to 911 lasts a total of approximately forty-five minutes. She began by explaining that she's a "vulnerable adult being held against [her] will." C.R.K. spoke in a hushed tone when explaining that her boyfriend beat her up days before. She twice remarked during the first minute of the call that she was scared. C.R.K. explained her visible injuries—a black eye and a split lip—and that her wheelchair was outside. Sometimes C.R.K. is difficult to

understand in the call—she does not yet know her jaw is broken.

C.R.K. spoke with the 911 dispatcher only until approximately the 08:55 mark when C.R.K. asked, "when will the cops be here?" and "how long?" The remainder of the call was silent. C.R.K. kept the 911 dispatch line open per the dispatcher's request. He asked her at least five times, "Chesley, can you hear me?" and she did not respond.

Two officers arrived at Mr. Isham's home at about 1:05am.[3] The driveway was snow-lined and the path to the entrance was narrow and icy. When Bois Forte Police Department Officer Danielle Boettcher knocked on the door, Mr. Isham answered. Officer Boettcher asked Mr. Isham several times whether C.R.K. was inside the residence. Mr. Isham repeatedly lied and at one point claimed that the last time he knew where C.R.K. was, she was at treatment in Virginia. Finally, C.R.K. yelled out, "I'm in here!" and Officer Boettcher asked, "who's in there?" Mr. Isham paused, and then stated, "Chesley."

Officer Boettcher and Deputy Sean Norland of the St. Louis County Sheriff's Office found C.R.K. on the bed in the living room. Mr. Isham sat on a chair alongside the bed where C.R.K. lay in the living room.

---

[3] Deputy Sean Norland activated his BWC during this incident. Bois Forte Police Department Officer Officer Danielle Boettcher did not have BWC available at this time.



Because C.R.K. was plainly hesitant to speak, Deputy Norland asked to speak with Mr. Isham outside the residence. Mr. Isham denied any abuse to Deputy Norland. Mr. Isham and Deputy Norland then went back inside the residence.  Once they entered, C.R.K. stopped talking with Officer Boettcher. Officer Boettcher then asked Mr. Isham to step outside.  Once outside, Officer Boettcher proceeded to ask Mr. Isham several questions. Mr. Isham admitted that he hit C.R.K. and Officer Boettcher placed him under arrest.

When Officer Boettcher reentered she announced that Mr. Isham was in her truck and that he had "admitted" it. Officer Boettcher asked C.R.K. to

provide a written statement as she called an ambulance to take C.R.K. to the Essentia Health-Virginia Hospital's emergency department.

       c.    *C.R.K. is Transferred from Virginia to Duluth for Medical Treatment Arising from a Broken Jaw and Split Lip*

C.R.K. arrived at the Essentia-Virginia Hospital in the early morning hours of March 24, 2023. At approximately 3:00am Dr. Brandon Drazich, the on-call Emergency Department physician, conducted an examination of C.R.K. and obtained a detailed patient history. In the examination, he noted a left periorbital contusion (black eye), a large hematoma to the occipital scalp, and a laceration to the inferior (lower) lip. He noted that C.R.K. presented with head and facial injury after an assault that occurred approximately five days before. He noted C.R.K. had some intermittent dizziness and nausea, and was unable to get away from her significant other until today. Dr. Drazich ordered a CT scan, which revealed a mildly displaced left mandibular fracture (a broken jaw). Dr. Drazich ordered C.R.K. IV pain medication and ultimately admitted her to the hospital based on her injuries and social situation.[4]

Essentia's general surgery department spoke with oral maxillofacial surgeon Dr. Scott Varland who recommended transferring C.R.K. to St. Mary's Medical Center in Duluth for surgery. On March 25, 2023, Dr. Varland performed a closed reduction with maxillomandibular fixation via Erich arch

---

[4] C.R.K.'s long term abusive relationship is also a part of her clinical history noted in the Essentia-Virginia Hospital Records.

bars. By re-aligning C.R.K.'s jaw to fix the fracture and then wiring C.R.K.'s jaw closed to ensure proper healing, C.R.K. was instructed to remain on a liquid diet for 6-8 weeks at which time the wires would be removed. Dr. Varland also stitched C.R.K.'s lacerated inferior lip and removed dead tissue that had accumulated since the injury.

Following the surgery on March 25, 2023, Kristen Hegstad, a licensed clinical social worker at St. Mary's Medical Center, encountered C.R.K. in her hospital room. C.R.K. reported Mr. Isham's abuse to Ms. Hegstad, who in turn filed a Minnesota Adult Abuse Reporting Center (MAARC) VA-CEP Report. That report notes C.R.K.'s recounting of the twenty-year abusive history between herself and Mr. Isham. Ms. Hegstad also worked with C.R.K. on discharge planning to ensure that she was discharged to a safe residence.

d.   *FBI Finds the Cane, Stick with a Knife, Feces, and Broken Glasses Where C.R.K. was Beaten*

Two days after surgery, on Monday, March 27, 2023, the FBI interviewed C.R.K. regarding the assault. Despite having her jaw wired shut, C.R.K. described the assault in extensive detail and in a manner consistent with her previous statements. During the interview, C.R.K. acknowledged that Mr. Isham has beaten her since getting out of prison in 2015. When describing this prior federal conviction for habitual domestic abuse, C.R.K. shared her view that she "paid for that."

C.R.K. described both the weapons the Defendant used to assault her on March 19, 2023: the wooden cane and the stick with a knife attached to it. C.R.K. further detailed that during the assault, Mr. Isham force fed her feces. C.R.K. explained the location where law enforcement would find these objects—near where the assault took place on the bed in the living room.

The FBI executed a search warrant at Mr. Isham's residence on March 31, 2023. Leaning against the wall opposite the bed in the living room, agents recovered the wooden cane and the stick with a knife next to each other. In the garbage alongside those items, the FBI discovered human feces. The agents collected bed sheets with a blood stain and another sheet from the floor with staining. C.R.K.'s broken glasses were sitting atop the dresser facing the bed in the living room.

 



An examination by the FBI laboratory interpreted blood staining of the tissue found on the floor alongside the bed. The profile from that bloodied tissue originated from one, female individual. The DNA results from that item are 4.5 septillion times more likely if C.R.K. is a contributor than if an unknown, unrelated person is a contributor.

e.  *Mr. Isham Has a History of Abusing and Restraining His Longtime Partner C.R.K.*

As outlined in further detail in Government's Motion *in Limine* No. 9, the government is moving to admit evidence of specific instances and patterns of Mr. Isham's previous abusive conduct. The government submits that this evidence is intrinsic to the underlying charged assault, or, alternatively, is other crime/bad act evidence pursuant to Rule 404(b). The specific nature of

this evidence is discussed in that motion and was previewed to Defense Counsel in the government's Rule 404(b) notice letter dated May 13, 2024.

In brief, Mr. Isham has an over twenty-year history of violently abusing C.R.K. Mr. Isham has been convicted of five tribal and/or state domestic abuse charges with C.R.K. as victim. Mr. Isham was also convicted of Domestic Abuse as a Habitual Offender by the U.S. District Court in the District of Minnesota in 2014. The case agent involved in this matter is the same case agent that investigated the facts underlying Mr. Isham's 2014 federal conviction.

The historical context of Mr. Isham's and C.R.K.'s relationship is a critical aspect of understanding the facts of this case and should be considered by the jury. Among other things, Mr. Isham's intent with respect to the conduct in question, lack of absence or mistake, the manner in which Mr. Isham has beaten C.R.K., Mr. Isham's motivation for abusing C.R.K., and circumstances surrounding the abuse (such as restraining C.R.K.'s movements after abusive episodes such as the one here) are all relevant to complete the story as to why C.R.K. yet again returned to Mr. Isham and struggled to report the abuse after it happened.

The government intends to call an expert witness in domestic abuse who will explain how cycles of violence and power as well as control dynamics define these types of longstanding abusive relationships. He will explain the phenomena of victims returning to abusers and the critical safety concerns

after separation events.

## VII. WITNESSES

At this time, the Government anticipates calling approximately ten (10) witnesses.[5] This will include law enforcement witnesses such as the officers involved in the March of 2023 arrest of Mr. Isham and the FBI's search of his home that led to the recovery of, among other things, the wooden cane and stick with a knife and bloodied sheets.

The United States will call four (4) witnesses who were involved in C.R.K.'s care while hospitalized after she called 911 to report the assault. This includes two treating physicians (the emergency department physician who treated C.R.K. at Essentia-Virginia Hospital and the oral and maxillofacial surgeon who treated C.R.K. at Essentia-St. Mary's Medical Center Duluth), a physician's assistant who treated C.R.K. in Virginia once C.R.K. was admitted to the hospital, and one licensed clinical social worker who completed the mandatory reporting (Minnesota Adult Abuse Reporting Center (MAARC) paperwork for C.R.K. prior to her surgery in Duluth.

The Government also anticipates calling two (2) expert witnesses. The Government will call FBI Forensic Scientist Tiffany Smith, who will testify

---

[5] In the official witness list filed under seal with the Court on May 20, 2024 pursuant to the trial order (ECF No. 51), the government included several records custodians on its exhibit list. Whether the government ultimately calls those witnesses, however, will turn on the Court's ruling on the government's motion *in limine* no. 5.

regarding the DNA testing of the swabs taken from various items collected from Ms. Isham's home after the assault, including a bloodied sheet, and the DNA report she authored in January 2024.[6] As introduced above, the Government will also call an expert in domestic violence relationship dynamics, Scott Miller, the Executive Director of the Domestic Abuse Intervention Programs and an expert in domestic violence relationship dynamics. Mr. Miller will serve as a blind expert who has not reviewed the underlying case file but will instead offer his opinions regarding a social science model used to describe and understand violent domestic partner relationships known as the Power and Control Wheel.

## VIII. EXHIBITS

The government has submitted its Exhibit List as a part of its May 20, 2024 pretrial filings. The government's evidence will include, but not be limited to, physical evidence, documentary evidence, prior sworn testimony, body worn camera (BWC) video, 911-call audio, and photographs.

## IV.    EVIDENTIARY ISSUES

a.    *Self-Authenticating Records under Fed. R. Evid. 902*

On May 13, 2024, the Government notified the defense of its intention to offer the following as self-authenticating records under Rule 902:

---

[6] The Government has recently learned that Ms. Smith may be unavailable to testify Tuesday, June 4th due to a scheduled a surgery on Wednesday, June 5th. We are actively working with the FBI laboratory to confirm the status of this witness.

| Source | Description | Authority |
|---|---|---|
| Essentia Health | Medical Records | Fed. R. Evid. 902(11) |
| Blue Water Oral and Facial Surgery f/k/a/ Oral and Maxillofacial Surgical Associates | Medical Records | Fed. R. Evid. 902(11) |
| St. Louis County Sheriff's Office – 911 Division | 911 Audio | Fed. R. Evid. 902(11) |
| Bois Forte Band of Chippewa | Certificate(s) of Indian Blood | Fed. R. Evid. 902(11) |
| Bois Forte Band of Chippewa Tribal Court | Certified conviction documents relating to Defendant's prior convictions | Fed. R. Evid. 902(1), 902(4) |
| St. Louis County, Minnesota District Court | Certified conviction documents relating to Defendant's prior convictions | Fed. R. Evid. 902(1), 902(4) |
| United States District Court – District of Minnesota | Certified conviction documents relating to Defendant's prior conviction | Fed. R. Evid. 902(1), 902(4) |

The Government acknowledges that there may be statements within these records whose admissibility must be determined by the Court (see, e.g., government's motion *in limine* No. 8 as to recorded statements in the 911 call and BWC footage). Nonetheless, the Government will rely on these certifications to establish the authenticity of the records, without calling a records custodian as to these items of evidence. As referenced below, several of these items

    b.   *Omnibus Motion Regarding Self-Serving Hearsay, Sequestration, References to Punishment, Prior-Act Evidence, and Business Records with Certifications (MILs Nos. 1-5)*

The Government has filed an omnibus motion *in limine* addressing

19

several matters that are standard requests prior to jury trials. The Government rests on the points and authorities set forth in that filing.

    c.    *Admissibility of Impeachment of the Defendant (MIL No. 6)*

The United States has moved *in limine* for a pretrial ruling granting the United States permission to use Mr. Isham's federal felony conviction for the limited purpose of impeaching Mr. Isham's credibility if he elects to testify in this trial: that on April 30, 2013, the Defendant pled guilty to a charge of Domestic Assault by a Habitual Offender, in violation of 18 U.S.C. §§ 117 and 1151, in the U.S. District Court for the District of Minnesota.[7]

Where, as here, the credibility of a testifying defendant is a key consideration in the case, the United States may use a defendant's prior felony conviction to impeach his credibility. In this case, the United States anticipates that if Mr. Isham chooses to testify, he will offer testimony that directly contradicts the testimony of other witnesses (for example, in asserting self defense). Accordingly, credibility will be a key factor in this case.

Mr. Isham's conviction is "highly probative of his credibility 'because of the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under

---

[7] Because Mr. Isham was not released until 2015 from his custodial sentence for his 2014 federal conviction, Fed. R. Evid. 609(a), *not* Fed. R. Evid. 609(b)(2), applies. *See* Fed. R. Evid. 609(b)(2 ("This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, *whichever is later*.") (emphasis added).

oath.'" *United States v. Headbird*, 461 F.3d 1074, 1078 (8th Cir. 2006) (overruled on other grounds). The Eighth Circuit has approved the use of felony convictions to impeach testifying defendants under Federal Rule of Evidence 609(a)(1)(B). *See, e.g.*, *United States v. El-Alamin*, 574 F.3d 915, 926 (8th Cir. 2009); *United States v. Jackson*, 310 F.3d 1053, 1054 (8th Cir. 2002).

In affirming the district court's decision to admit proof of prior convictions for impeachment of testifying defendants, the Eighth Circuit has noted that the probative value of such impeachment evidence is particularly high where, as here, the jury will be asked to determine the credibility of competing stories by the defendant and the government's witnesses. *Jackson*, 696 F.2d at 589 (noting that the probative value of the prior conviction "was further enhanced by the critical role that [defendant's] credibility would have played in this case if he had chosen to testify"); *United States v. Brown*, 956 F.2d 782, 787 (8th Cir. 1992) (noting that because jury "had to choose between one version of the events presented by the government's witnesses and another version presented by defendant's," credibility was necessarily a "critical factor in jury's choice," and the defendant's prior burglary conviction was "highly probative" on the issue of credibility)

The United States respectfully requests the opportunity to cross-examine Mr. Isham regarding his 2014 prior felony conviction should he testify.

d.    *Jury Nullification (MIL No. 7)*

The United States requests that the Court preclude Mr. Isham and his counsel from arguing, presenting evidence, or pursuing lines of inquiry designed to elicit jury nullification. It is improper for a defendant to suggest in any way that the jury should acquit a defendant even if it finds that the government has met its burden of proof. *See, e.g.*, *United States v. Wiley*, 503 F.2d 106, 107 (8th Cir. 1974) ("To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable."). Courts in this District have repeatedly held that "arguments or evidence by [the defendant] encouraging jury nullification lack any relevance or probative value and are contrary to the instructions that [courts] will provide to the jury." *See, e.g.*, *United States v. Mayer*, No. 19-96 (WMW), 2021 WL 2434121, at *5 (D. Minn. June 15, 2021) (granting the government's motion *in limine* to preclude jury nullification argument and evidence).

Here, there are a variety of defense themes which the government anticipates could quickly stray into improper jury nullification. For example, cross examination, arguments, or other evidence aimed at challenging the fundamental fairness of treating assault between domestic partners as a

criminal matter rather than a social or civil matter would invite the jury to weigh the propriety or fairness of the statutes charged, rather than applying the evidence to the legal instructions provided. Federal and Minnesota state law operate together to confirm that: assault occurring in Indian Country which rises to felony severity is indeed a federal criminal matter. The defense may certainly challenge whether the government has established that assault occurred, or whether the assault occurred under the circumstances alleged, but they may not invite the jury to question the merits or fairness of the statutes themselves or the policies behind them. Similarly, it would be improper jury nullification for the defense to imply that personal dynamics and chemical dependencies might justify assault among domestic partners, because such themes would invite the jury to look beyond the evidence and instructions in this case and substitute a broader policy-making role for their fact-finding role.

Thus, the government requests an order precluding the defense from arguing or otherwise presenting evidence or pursuing lines of inquiry designed to elicit jury nullification and reserves the right to seek curative instructions in the event attempted nullification occurs.

e. *Recorded Statements and Prior Acts and Patterns of Abuse (MIL Nos. 8, 9)*

The Government has filed two motions *in limine* addressing the admissibility of recorded statements in the 911 call audio and BWC footage

(MIL No. 8) and the admissibility of specific, prior instances and patterns of domestic abuse by Mr. Isham (MIL No. 9). The Government rests on the points and authorities set forth in those filings, noting as well that these issues may also arise during trial pursuant to Fed. R. Evid. 608.

f.   *Medical Records Exception to Hearsay by C.R.K. (MIL No. 10)*

The government intends to admit at trial medical records from Essentia-Health Virginia Hospital, Essentia Health-St. Mary's Medical Center, and Blue Water Oral and Facial Surgery f/k/a/ Oral and Maxillofacial Surgical Associates pursuant to Rule 803(6). Several of these records, however, contain statements made by C.R.K. related to her injuries and the underlying abuse. The government seeks a pretrial ruling that certain statements in the medical records are admissible under Rule 803(4).

Relevant excerptions of those records include the following:

**Patient:**
Chesley R Knott

**Means of Arrival:**
Ambulance (TOWER)

**Chief Complaint:**
Assault and Head Injury With Loc (Assaulted by significant other)

**History of Present Illness:**
43-year-old female presenting with head and facial injury after assault.  Was hit in head and face area multiple times approximately 5 days ago.  Initially, quite a bit of head pain and some neck pain, dizziness, and nausea.  Since then, pain has subsided.  Has noticed a large bump to back of head, cut to bottom lip, redness of left eye.  Still has some intermittent dizziness and nausea.  Unable to get away from her significant other, the assailant, until today.  Currently, no headache, vision changes, malocclusion, neck pain, chest pain, dyspnea, abdominal pain, pain or injury to extremities.

**Assault**
Pertinent negatives include no chest pain, no numbness, no visual disturbance, no vomiting, no headaches, no weakness and no cough.

**Emergency Department Course:**
**Medical Decision Making**
Based on history and exam, this is assault with traumatic head and facial injuries.  Occipital scalp
hematoma, left subconjunctival hemorrhage and traumatic chemosis, and lip laceration are apparent.
Possibility exists for intracranial injury and I am particularly concerned about her report of early
nausea/vomiting, though I note no neurologic deficits on my exam.  Face seems stable and no obvious
fracture or deformity initially.  Despite the IV trauma, vision seems intact and no particular indicators of globe
injury or retrobulbar hemorrhage; I certainly would have expected symptoms to declare themselves by now.
No sign of neck, back, spine injury or injury to thorax, abdomen, pelvis, or extremities.  We will plan CT
head/face/C-spine, chest x-ray, and labs.  Likely to require admission for combination of the injuries and
social situation.

**ED Course** as of 03/26/23 0759
Fri Mar 24, 2023
0329   XR Chest 2 Views
        On my personal interpretation, I note no
        pneumothorax and no obvious displaced
        rib fracture. [BD]
0448   Labs returned largely unremarkable aside
        for some mild anemia, creatinine elevation
        consistent with CKD.  Imaging finding
        shows left mandibular angle fracture.
        Discussed with Dr. Colling of trauma
        surgery, agrees that majority of these
        traumatic injuries could be managed here
        and largely will require some degree of
        outpatient follow-up.  Nonetheless, patient
        has no safe discharge plan.  High risk of
        being returned to abusive situation, high
        risk of morbidity/mortality if discharged into
        the situation.  Her assailant has
        additionally taken her wheelchair in an
        attempt to limit her ambulation status.
        Therefore, will plan for admission where
        further social work consultation can be
        obtained and neck steps for ideal medical
        care can be taken. [BD]

**ED Course User Index**

**H&P Notes (continued)**

**HPI:**
43-year-old female with history of HTN, type 2 DM, CKD, left above knee amputation, is admitted to EHVH
due to multiple facial injuries received during domestic violence assaults occurring over the last 5 days. She
states that her SO hit her numerous times in the head and face over the last 5 days, she was only able to
escape the situation today and came to the ED. Reported to ER staff that this has been going on for the last
20 years. She is homeless, no family involvement, has been staying with friends and SO. In the ED she was
found to have multiple contusions to the face and scalp. CT imaging shows a closed mildly displaced left
mandibular fracture, no intracranial pathology. She is admitted for observation as she has no safe
disposition. At time of admission she denies headache, dizziness, vision changes, chest pain, dyspnea,
abdominal pain, injuries to extremities.

    "Statements made for purposes of medical diagnosis or treatment and

describing medical history, or past or present symptoms, pain, or sensations, or

the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible under the hearsay exception Rule 803(4). Rule 803(4) admits three types of statements: (1) medical history, (2) past or present sensations, and (3) inception or general cause of the disease or injury. All three types are admissible where they are "reasonably pertinent to diagnosis or treatment." *United States v. Iron Shell*, 633 F.2d 77, 83 (8th Cir. 1980).

"Statements concerning what happened" during as assault, so long as relevant to diagnosis and treatment, are admissible under the rule. *Id.* (affirming the lower court's admission by the examining physician was allowed under rule 803(4) to repeat the child's description of the assault including the victim's statements concerning the cause of the injury"). Further, the Eighth Circuit has held that statements made by the victim of abuse to "a physician, including identification of the abuser, are admissible under Rule 803(4) where such statements were reasonably pertinent to the diagnosis and treatment of the [victim's] physical or psychological injuries." *United States v. Balfany*, 965 F.2d 575, 579 (8th Cir. 1992). Animating concerns in this context include not only the identification and treatment of physical injury, but emotional and psychological problems, and the prevention of future occurrences of abuse and to the medical safety of the reporting individual. *See United States v. Peneaux*, 432 F.3d 882, 894 (8th Cir. 2005).

26

The government seeks to present medical records at trial showing that C.R.K. reported her physical condition and injuries, the genesis of those injuries (trauma from abuse), and the history of abusive contact with Mr. Isham (referred to as a "significant other" or "SO" in the records) to Essentia providers. The reporting of C.R.K.'s physical condition, the origins of the injury, and description of the injuries were plainly relevant to diagnosis and treatment. For example, her occipital scalp hematoma, left subconjunctival hemorrhage, and traumatic chemosis produced by trauma to the face and head motivated the ER physician to order CT imaging of the head and neck and push intravenous pain relief.

Further, the treating ER physician will testify that the team made the decision to admit C.R.K. from the emergency department to the hospital based on "morbidity/mortality" concerns raised during C.R.K.'s examination (noting, for example, a "high risk of returning to abusive situation" and that the "assailant has… taken her wheelchair in an attempt to limit her ambulation status"). These reports gathered during the patient history and physical examination portion of C.R.K.'s time in the emergency department indeed necessarily directed the specific course of her treatment. Thus, her statements regarding the abuse should be admitted under Rule 803(4).

Next, the licensed clinical social worker with whom C.R.K. met at St. Mary's Medical Center—Kristen Hegstad—created a mandatory report of the abuse disclosed by C.R.K. (Minnesota Adult Abuse Reporting Center (MAARC) VA-CEP

Report). That report is a part of C.R.K.'s medical records during the time in which she was hospitalized for jaw surgery. The report, therefore, is admissible as a part of the medical records pursuant to Rule 803(6), covered by the government's motion *in limine* no. 5. The report, unsurprisingly, contains various statements made by C.R.K. to Ms. Hegstad about the long-term nature of Mr. Isham's abuse and the manner in which she was abused on or about March 19, 2023. Ms. Hegstad will explain that reports in these types of circumstances effect discharge planning.

Even if C.R.K.'s statements within the mandatory report are not admissible under Rule 803(4), subject to the manner in which C.R.K. is cross examined, these statements may nonetheless be admissible as consistent statements under Rule 801(d)(1)(B).

g.  *Transcript of the 911 Call*

The government will play transcripts along with the 911 call that it intends to introduce as evidence in this case (Gov. Ex. 1). The 911 call contains admissible statements made by C.R.K. and the 911 dispatcher. The Government anticipates providing proposed transcripts to defense counsel in advance of trial with the goal of reaching agreement. *See United States v. Gonzalez*, 365 F.3d 656, 660 (8th Cir. 2004) ("[W]e believe that whenever the parties intend to introduce a transcript at trial, they should first try 'to produce an 'official' or 'stipulated' transcript, one which satisfies all sides").

h.    *C.R.K.'s Grand Jury Transcripts*

C.R.K. testified before a federal grand jury in connection with Mr. Isham's conduct on two occasions: for this case and as a part of the investigation leading to Mr. Isham's 2014 federal habitual domestic offender conviction. The government hereby notices that subject to the nature and content of C.R.K.'s testimony at trial, these transcripts may be offered as substantive evidence pursuant to Rule 801(d)(1)(A).

Dated:  May 20, 2024                                Respectfully Submitted,


                                                    ANDREW M. LUGER
                                                    United States Attorney


                                                    */s/ Carla J. Baumel*

                                                    BY: CARLA J. BAUMEL
                                                    BY: NICHOLE J. CARTER
                                                    Assistant U.S. Attorneys