SUNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 23-CR-205 (KMM/LIB) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MARK ISHAM'S** |
| | ) | **SENTENCING POSITION** |
| MARK ALLEN ISHAM, | ) | |
| | ) | |
| Defendant. | ) | |

Just a few days ago I sat in the Nett Lake kitchen of Marybell Isham, Mark Isham's mother. We of course talked about the changing weather. The frost that had come that night. We talked about her health. And as was to be expected, the conversation then turned to Mark. She asked about her son. She was guarded and I think she tested me to see if her own recent observations of Mark were the same as mine. By all of the accounts I have received over the last many months from his family and friends, when he is sober, Mark is a decent, soft spoken, quick to laugh man. A description that matches my own experience. As Mark's mother and I talked she turned the conversation again back to Mark. This time it was the good decent Mark that Marybell told stories of. The kind man who helps his mother and loves to go ricing in the fall. But, as everyone is also aware, there is another Mark. When he drinks and he uses he gets in trouble—and when he and C.K. are together their decades long relationship unfortunately often turns toxic. Near the end of my visit with Marybell, she told me she hopes for a few things for her son. She hopes he will stay sober. She hopes he will finally once and forever recognize he cannot have a relationship with C.K. And, she hopes she will live long enough to have Mark sit in her kitchen on a cold fall morning.

1

Mr. Isham adopts the PSR with the following exceptions. He objects to paragraph 10. He also objects to paragraph 14 and the requested restitution. He joins probation's uncertainty the requested restitution is compensable. Mr. Isham also has the following objections and motion regarding the sentencing guidelines.

### I. Mr. Isham objects to the PSR's 4-level increase for the use of a dangerous weapon.

Mr. Isham objects to the PSR's inclusion of a 4-level enhancement for the use of a dangerous weapon. (PSR ¶ 25) (ECF #104). On his sentencing date, amended guideline section 1B1.3 will be in effect (unless Congress acts differently). The amended guideline will generally exclude acquitted conduct from the scope of relevant conduct considered under the sentencing guidelines. The amendment recognizes the Supreme Court's disfavor of the use of acquitted conduct in sentencing. *See McClinton v. United States,* 143 S. Ct. 2400 (2023). In this case, the acquitted conduct is exactly representative of the conduct disfavored by the Supreme Court.

Historically, the Eighth Circuit expressly permitted district courts to consider acquitted conduct in sentencing if the conduct has been proved by a preponderance of the evidence. *United States v. Papakee*, 573 F.3d 569, 575 (8th Cir. 2009); *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998). And acquitted conduct can be considered "relevant conduct" in the context of an extended scheme. This means that if the acquitted conduct is part of the same course of conduct or common scheme or plan as the conduct underlying the counts of conviction, it can be used to determine a defendant's offense level under the advisory U.S. Sentencing Guidelines. *United States v. Hogue*, 66 F.4th 756, 765

(8th Cir. 2023); *United States v. Anderson, United States v. Jefferson*, 652 F.3d 927, 931 (8th Cir. 2011). Here, Mr. Isham was acquitted of Count 1, Assault with a Dangerous Weapon and convicted of Count 2 of Assault Resulting in Serious Bodily Injury and Count 3 of Assault Resulting in Substantial Bodily Injury. It appears the Government intends to rely on the outdated Eighth Circuit guidance and argue for a sentence enhancement under USSG §2A2.2(b)(3) for use of a dangerous weapon in commission of the conduct underlying Counts 2 and 3. (ECF #101). But the Government's argument fails to recognize the changing law and also fails to meet the burden of proof by a preponderance of the evidence.

As the Court is aware, the two dangerous weapons that were alleged to be involved here are a cane and a knife attached to the end of a long stick, which Mr. Isham testified to using for cutting cedar boughs to make wreaths. Both items were submitted to the FBI Laboratory in Quantico, Virginia for forensic and DNA testing. Both items were subjected to a presumptive test for blood; this test indicated the presence of blood on the cane, but blood was not indicated on the knife. The FBI DNA analyst testified that she decided not to perform DNA testing on the knife given the lack of blood because DNA from C.K. could transfer through other means simply by her living in the house, and she did not feel the test would be revealing. (Partial Trial Tr. at 39, ECF No. 112) During cross-examination, the DNA analyst testified as follows:

> Q. Ms Smith, your laboratory looked that stick with a knife over completely and found no indication of blood on that, correct?
>
> A. Blood was not detected, that is correct.

> Q. You did no DNA testing, correct?
>
> A. That is correct.

(Partial Trial Tr. at 49, ECF No. 112). Later, on re-cross, she testified:

> Q. So we have no forensic evidence related to the knife and hockey stick, correct?
>
> A. For the DNA Casework Unit, that is correct. I cannot speak to other forensic exams that may or may not have been done on that item.

(Partial Trial Tr. at 62, ECF No. 112).

DNA analysis was also conducted on the cane to determine whether the presumptive blood belonged to C.K. The results, however, were equally likely if C.K. and an unknown, unrelated person are contributors than if two unknown, unrelated people are contributors. (Gov't Ex. 7, 1-2). The DNA analyst testified that this result is considered uninformative, and it cannot be said whether the surface of the cane contained C.K.'s DNA. As for the cane, while the presumptive test for blood was positive, the test is not a guarantee that blood is present on an object. (Partial Trial Tr. at 37-8, ECF No. 112). Moreover, the Government failed to meet its burden and show the cane was used, as the DNA analysis on the cane was uninformative as to whether the DNA belonged to C.K. Rather, the DNA analyst, in her expert opinion, only interpreted the results to show a mixture of DNA from two individuals. (Partial Trial Tr. at 34, ECF No. 112). Regarding these results, she provided the following testimony:

> Q. In the end, what the jury can take away from your testimony is you cannot say, no one can say, that C.K.'s DNA was on the cane, correct?

4

>A. That is correct. When I compared C.K., her result was uninformative.
>
>Q. You can't say her DNA was on the cane, correct?
>
>A. No. And I can never say that, I can never say it's someone's DNA. I can say whether they match or are excluded, but I will never say it's them to the exclusion of all others.
>
>Q. And you can't even get that close here?
>
>A. Not on the cane, no. The results were very limited.

(Partial Trial Tr. at 53, ECF No. 112). With this complete lack of conclusive physical evidence, the Government cannot meet its burden by a preponderance of the evidence to support an enhancement for acquitted conduct.

Even if the Court assumed the material on the cane was blood, and even if the Court assumed that one of the DNA profiles belonged to C.K., there is still insufficient evidence to support that the cane itself was used in the assault. Similarly, there is no evidence to support the use of the knife in the commission of the assault. There was no indication of blood, let alone DNA evidence consistent with that of C.K. Absent her testimony to being poked in the face with the knife, there is no other evidence that it was used. There were no cuts or scratches on C.K.'s face consistent with this claim, nor did she reference the knife or cane in her written statement to law enforcement. (*See* Gov't Ex. 17; Gov't Ex. 12). Officer Danielle Boettcher testified to telling C.K. to take as much time as needed to write a statement on the assault and what had happened, but C.K. still did not include the use of the weapons, and she did not mention either weapon until several days after her 911 call

and removal from Mr. Isham's home. With time, her narrative then shifted to include the weapons in the assault, contrary to her initial interactions, verbal and otherwise, with law enforcement about the assault. In short, there is no physical or corroborating evidence to support the use of dangerous weapons in the commission of the assault and no showing by a preponderance of the evidence to justify the enhancement.

Given the lack of sufficient evidence, the jury acquitted Mr. Isham of Count 1 of Assault with a Dangerous Weapon. The jury therefore found there was at least reasonable doubt as to the use of the cane and knife, and the Court should take this acquittal at face value during sentencing and uphold the constitutional sanctity of the jury verdict. The Government may argue the jury acquitted Mr. Isham of Count 1 of Assault with a Dangerous Weapon because they believed Mr. Isham's voluntary intoxication defense, and not because they believed there was a reasonable doubt as to whether the cane or knife were used in the assault. However, this position is contrary to the Supreme Court's position in *McElrath v. Georgia* that "Once there has been an acquittal, our cases prohibit *any* speculation about the reasons for a jury's verdict—even when there are specific jury findings that provide a factual basis for such speculation—'because it is impossible for a court to be certain about the ground for the verdict without improperly delving into the jurors' deliberations.'" 601 U.S. 87, 97 (2024)(citing *Smith v. United States*, 599 U.S. 236, 252-53 (2023)(holding jury acquittal by reason of insanity was an acquittal for purposes of Double Jeopardy Clause notwithstanding apparent inconsistency with other verdicts rendered by jury). While the legal issue in *McElrath* is admittedly distinct from the issue present here, this sentiment is similar to that expressed by the Supreme Court in *United*

*States v. Watts*, stating, "[I]t is impossible to know exactly why a jury found a defendant not guilty on a certain charge. 'An acquittal is not a finding of any fact. An acquittal can only be an acknowledgement that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences…'" 519 U.S. 148, 155 (1997)(citing *United States v. Putra,* 78 F.3d 1386, 1394 (9th Cir. 1996)). While the Court in *Watts* used this principle to hold the defense cannot infer an acquittal was reached because of belief in the defendant's innocence, the principle must apply both ways. The Government cannot inappropriately dissect a jury's verdict to extract the reason for acquittal, argue the reason was the affirmative defense of voluntary intoxication, and then use this improper thought experiment to draw factual inferences in support of the enhancement.

Mr. Isham also submits the Court should recognize the changing legal landscape on the use of acquitted conduct in sentencing when deciding whether to impose the enhancement. While the consideration of acquitted conduct in federal sentencing is a longstanding and widespread precedent in all federal circuits following its affirmation by the Supreme Court in *United States v. Watts*, it has remained a contentious issue, and the legal landscape is shifting due to recent action by the Supreme Court and the United States Sentencing Commission. These developments suggest that the use of a defendant's acquitted conduct in sentence enhancements is on shaky ground and becoming increasingly untenable.

In *Watts*, the seminal case on the issue, the Supreme Court held that a jury's verdict of acquittal did not prevent the sentencing court from considering conduct underlying the

7

acquitted charge, so long as that conduct had been proved by a preponderance of the evidence. 519 U.S. 148 (1997). In its opinion, the Supreme Court stated that the district court's position conflicted with the implications of the Sentencing Guidelines under § 1B1.3, which directs judges in sweeping language to consider the relevant conduct of a criminal defendant at sentencing, including evidence of additional criminal conduct that the defendant has not been convicted of. *Id*. at 152-3. As a result, the Eighth Circuit Court of Appeals has consistently upheld this use of acquitted conduct by a preponderance of the evidence standard. *See United States v. Canania*, 532 f.3d 746 (8th Cir. 2008); *United States v. Papakee*, 573 F.3d 569, 572 (8th Cir. 2008); *United States v. Stroud*, 673 F.3d 854, 863 (8th Cir. 2012); *United States v. Oakie*, 993 F.3d 1051, 1054 (8th Cir. 2021); *United States v. Ruelas-Carbajal*, 933 F.3d 928, 930 (8th Cir. 2019); *United States v. Dickson*, 70 F.4th 1099, 1105 (8th Cir. 2023).

However, in 2023, the defendant in *McClinton v. United States* petitioned the Court, challenging the constitutionality of the use of acquitted conduct in sentencing. The defendant in that case was acquitted of killing an alleged accomplice but convicted of robbery and gun charges. At sentencing, however, the district court concluded by a preponderance of evidence that McClinton was responsible for the death and sentenced him to 19 years in prison rather than the alternative range of five to six years. The Supreme Court denied cert, but Justices Kavanaugh, Gorsuch, Barrett, and Sotomayor stated the denial should not be misinterpreted, as the issue raises important concerns. In their concurring statements in denial of *McClinton*, several justices expressed concerns about the fairness and constitutionality of the use of acquitted conduct but felt it appropriate to

8

wait for the Sentencing Commission to decide on the issue. *McClinton*, 143 S. Ct. at 2403. In her concurring opinion, Justice Sotomayor emphasizes the importance of juries and the dubious procedural fairness in using conduct acquitted by a jury in sentencing, stating:

> [I]t is questionable that a jury's refusal to authorize punishment is consistent with the judge giving the defendant additional years in prison for the same alleged crime. The fact is that even though a jury's specific reasons for acquittal will typically be unknown, the jury has formally and finally determined that the defendant will not be held criminally culpable for the conduct at issue.

*Id*. at 2402. She also flags concerns about procedural fairness and accuracy when the Government gets a second chance with evidence that did not convince a jury coupled with a lower burden of proof and public perception of justice and faith in the legitimacy of the criminal justice system. *Id*. These statements indicate an evolving judicial perspective on the use of acquitted conduct in sentencing and suggest a willingness of the Supreme Court to reexamine the issue and overturn or differentiate *Watts* in its upcoming session, pending action by the Sentencing Commission.

As this Court is aware, on April 17, 2024, the United States Sentencing Commission acknowledged the Supreme Court's call and voted unanimously to prohibit conduct for which a person was acquitted from being used in calculating a sentence range under the federal guidelines. In adopting this resolution, the USSC added the following amendment to § 1B1.3:

> "(c)   Acquitted Conduct. —Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."

Amendments to the Federal Sentencing Guidelines, 1 (Apr. 17, 2024) https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-

amendments/202405_Amendments.pdf.

This amendment, set to take effect on November 1, 2024, unless Congress acts, underscores the evolving view that enhancing sentences based on acquitted conduct is procedurally and fundamentally unfair and undermines the significance of jury verdicts. Given this shift, enhancing Mr. Isham's sentence for use of a dangerous weapon is incompatible with the emerging legal standards and conceptions of justice.

### II.     Mr. Isham objects to the 2-level increase for obstruction of justice.

Mr. Isham objects to the 2-level increase for obstruction.  The phone calls between C.K. and Mr. Isham were mutual.  He certainly had an obligation not to speak to her because of the no contact order.  But Mr. Isham never threatened C.K. during those calls. She did not feel she was in danger.  In his mind he was simply asking her to the tell the truth.  That he did not use the "dangerous" weapons, just as the jury found.  That he hit her in self-defense, just as he testified.  His intent was that she tell the truth.  Telling a witness to tell the truth is not obstructive.  And while the jury did not believe Mr. Isham was acting in self-defense, there is no evidence that Mr. Isham did not believe what he was telling C.K. or the jury.  The Court should reject the 2-level increase for obstruction of justice.

### III.    Mr. Isham was in Tribal custody related to this case. Pursuant to §5G1.3(b) he asks this Court to adjust his sentence to reflect his custody credit.

On March 24, 2023, Mr. Isham was arrested and detained in tribal custody.  (PSR at F.1).  He was charged with the same offense conduct that forms the basis of his conviction.  He was transferred to Federal custody on June 29, 2023.  His total time in

10

tribal custody was 96 days.

Mr. Isham respectfully requests the Court credit him the 96 days he was in tribal custody as the case is captured by the instant federal offense. As the Court is aware, when the term of imprisonment being served has the same relevant conduct as the instant offense the Court "shall adjust" the term of the instant sentence to reflect credit for the previously served sentence. U.S.S.G. § 5G1.3(b)(1). Mr. Isham's custody history, beginning with his arrest on March 24, 2023, is a result of conduct directly related to this case. He respectfully requests this Court adjust his sentence so that he may receive credit for the time he was in tribal custody from March 24, 2023, until June 29, 2023, a period of 96 days.

**IV.   A sentence of 41 months accomplishes the goals of sentencing.**

Considering the 18 U.S.C. § 3553(a) factors—including the nature and circumstances of the offense; Mr. Isham's history and characteristics; the need for the sentence to reflect just punishment, deterrence, and public safety—a sentence of 41 months is "sufficient, but not greater than necessary, to" achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Assuming the Court adopts Mr. Isham's guideline objections and determines the appropriate sentencing guideline range is 41-51 months, a sentence at the bottom of the box reflects the circumstances of this case.

As Marybell explained to me, Mr. Isham needs to stay away from C.K. Mr. Isham has told me the same. They have a lot of history together and that history has clouded his judgment for years. Turning points do come, even when there is a history that suggests

the turning point is long overdue. Mr. Isham is 60 years old. He knows he will still spend more time in prison. He is tired of it. He is tired of missing ricing season. He is tired of not seeing his sons who he is so very proud of. He knows that when he is released, to do the things he loves he will need to stay away from C.K.

The question of how he accomplishes that is pretty clear, he needs to stay sober. Clearly a big issue is Mr. Isham's lifelong substance abuse. There is of course no argument that when Mr. Isham uses, he often gets into trouble. The truth is he will likely continue to struggle with sobriety. To succeed, he needs the supervision this Court can order. He needs this Court's help to continue the change. With structure and accountability he can be sober. (PSR at ¶97). It is the through the combination of age and this Court's supervision that Mr. Isham can build the foundation to be sober. And with his sobriety he will stay away from C.K.

The PSR tells Mr. Isham's story in a cold recitation of his criminal history and substance use. He of course is much more. He is flawed. He struggles with substance abuse. But he is also a beloved son and father. He collects VHS movies. He tinkers on old things. He is a bit of a pack rat. He smiles and laughs. And, he loves to be in a canoe with knocking sticks and to settle into the back and forth rhythm as the manoomin falls into the bottom of the canoe with the promise of a good future.

A 41 month sentence is sufficient.

Dated: October 18, 2024.	Respectfully submitted,

*s/ Aaron Morrison*

AARON MORRISON
Attorney ID No. 0341241
Attorney for Mr. Isham
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415